Our last case of the morning is, well, five cases, 119-870-871-872-873-874, Consolidated. J&J Ventures Gaming, LLC v. Wild, Inc., XL Entertainment Gaming, LLC, and all its employees. Are you ready to proceed? Ready? And you've split your time, I see, and so, Counselor? We did, Your Honor. May it please the Court, good morning. My name is Tim Eaton, and I represent J&J, Counselor. And I will be splitting my time with Mr. Gantz. The two issues that we're going to address this morning before the Court, the first one deals with subject matter jurisdiction, a popular topic this day in this Court. And the second one is, assuming there is jurisdiction, should the Appellate Court have affirmed the Circuit Court decision in our favor, in my client's favor? And in addition, there were four other cases that were appealed, as the Chief Justice just mentioned, where we also won, and they also went to the Fifth District. And then there were subsequent decisions from the Fifth District, which were in line with this one. Let me explain a little bit about procedural posture, too, because we're in somewhat of an unusual situation. The parties appealed to the Appellate Court. In this case, ironically, even though we sued the defendant while the country, Excel intervened, and they were allowed to intervene. The defendant who lost the case, which was a simple breach of contract case, did not appeal. But the intervener did, Excel. It went to the Fifth District. During oral argument, the Court said, do we have subject matter jurisdiction? Both sides said, yes. Well, we want to have briefing on that. Both sides briefed it and said, yes, you have subject matter jurisdiction. The Fifth District disagreed with us. They then entered the opinion saying that there was no subject matter jurisdiction and that there was exclusive jurisdiction in the Gaming Board on these types of cases, even though for years, and in thousands of agreements like this, they had never litigated in the Gaming Board a contract dispute. And that's what this is, a plain and simple contract dispute. The Appellate Court found, however, in going through the Gaming Act, although there was nothing explicit about jurisdiction, as a matter of fact, these types of pre-license agreements are not even mentioned in the Act, not even referenced once. There's no procedure set forth for hearings on these types of cases. The Court felt that because this was a comprehensive statute that dealt with licensing, therefore there must be exclusive jurisdiction. We sought a certificate of importance under 316. The Appellate Court granted it. So that's why we're here on the issue of jurisdiction. We're the appellant because we found the certificate, although both the appellant and the appellee excel agree that there's subject matter jurisdiction. At that point, the State of Illinois, the Gaming Board, filed a motion to intervene and this Court granted it, and they're here to argue that there is exclusive jurisdiction in the Gaming Board. So that's the procedural posture that we find ourselves in. In the Circuit Court, again, there were multiple cases, but the one I'm going to address is Wild Country because they're all the same issues. In the Circuit Court, we found a breach of contract action against Wild Country, saying we had an agreement, a location agreement that was signed years ago that J&J had just been assigned the rights under, and under that agreement, we get to put our video gaming terminals in your establishment when and if the Board approves you as a licensed location. And they, Wild Country, had gone ahead and entered into another agreement with Excel to do the same thing. So we filed a declaratory judgment action saying there's a real controversy here, they're going to breach our contract, and we want you to enjoin them from allowing Excel to go forward with their contract that was entered into later. As I said, we won. That's the dispute. It's a simple breach of contract matter. And there is nothing in this Act that says that these type of pre-license agreements are going to be adjudicated before the Gaming Board. There simply is no indication at all in that Act. There's nothing explicit. There's nothing implicit. Mr. Regan, is the Board correct that the validity of the contract at issue can't be determined, can't be determined if it's a valid use agreement, and the statute grants the Board the exclusive right to determine what is a use agreement? Your Honor, with respect to the latter, because I think it answers your former question, there's nothing in the Act that says the Board has exclusive jurisdiction to determine whether or not these are use agreements or not. As a matter of fact, historically, the courts have dealt with issues of statutory interpretation, obviously common law breach of contract cases. These are the type of cases that certain courts handle every day. In over 7,000 licenses that have been issued under the Gaming Act, there has not been one hearing on a contract dispute regarding a location agreement that's not a use agreement yet, as in this case. Not one. And the Board has routinely looked at these agreements and have approved them. And the court in the 3rd District in Triple 7 said that these agreements were perfectly valid. Jurisdiction was never raised there. They never thought they didn't have jurisdiction. There's nothing expressed, Your Honor, in the Act itself that says there's exclusive jurisdiction. And if you look at the Act in terms of the type of hearings they contemplate, they contemplate a hearing if there's a denial of a license. They contemplate a hearing if there's a violation by a licensee once they're licensed. No reference to any type of hearing with respect to one of these location agreements, which is not yet a use agreement. And I might add, the definition of a use agreement is very, very simple. It's nothing that requires expertise of the Board. For example, it says it must be between a license operator, terminal operator, and a license establishment. Courts can figure that out. It says it needs, that there was an affirmative statement that there was no inducement offered for it. There needs to be indemnity. It prohibits assignments except between terminal operators. That's it. A circuit court can determine that. And I think... What about the fact that this subject matter really has to do with gambling? And that gambling contracts are illegal other than under the special law. Yes. Let's talk about that. How does that play into your argument? Well, Your Honor, it's interesting. All the cases that have been cited by the State where it's been held that the contract was illegal because of gambling were decided by State circuit courts or public courts. All the cases. It doesn't mean that the Board can only decide that. Even if it's arguably illegal, which it's not. And Mr. Gantz is going to cover why. That is a type of case that is traditionally and historically decided by State courts. And to say that these are illegal when the contract itself references the use agreement, in fact it has all the terms in it, it's pursuant to the Video Gaming Act. That's unlike any case the State has been able to decide. There's not one case where they have found that it's illegal gambling where it was pursuant to an act, which we have here. So that is historically something that this court can decide. The Esposito case that was decided by this court in a referral agreement. And it involved a workers' compensation case. But the agreement itself was a contract between two parties. One party didn't even participate in hearings before the Board. And this court found correctly that the act doesn't cover this type of thing. This is a mere contract dispute and there was subject matter jurisdiction. Crossroads has been cited by the Circuit Court because this court in Fields Jeep had already held that the Circuit Court did not have jurisdiction to determine in deciding good cause what would be in the public welfare. That was a policy issue. And therefore in response to this court's opinion, they formed a board to determine these good cause determinations. And then it could go back to the Circuit Court if there was not good cause to pursue it on damages. There that two-step process made sense because the act contemplated that there would be this hearing. Here there is no indication whatsoever in the statute that these types of cases which involve mere contract disputes cannot be decided by the state court. And all the cases that this court has held with Belleville and Toyota where obviously they said there's been a sea change since the 1964 amendments to the judicial article and then the 1970 constitution, where it's the constitution that gives the jurisdiction over justiciable issues to the Circuit Court. And unless the statute either explicitly or in crossroads by looking at all the circumstances indicates that this is something that requires expertise of the board or they intended for there to be jurisdiction, then and only then can you have exclusive jurisdiction. Here that is not present in this act. There's nothing in this act that suggests there should be jurisdiction only in the board. So we would respectfully ask this court to reverse the Fifth District and say that there was subject matter jurisdiction and then to go further and affirm the rulings of the Circuit Court. And I'll yield the rest of my time to Mr. Gantz. Thank you. May it please the court. My name is Bill Gantz and I represent Action Gaming. In addition to restoring the subject matter jurisdiction of the Circuit Court and this court, the plaintiffs asked this court to affirm the decision of the Circuit Court entering judgment in favor of the plaintiffs and enforcing the very contracts that bring us here today. These are simple contracts which the parties entered into to propose terms for proposed gaming operations subject to licensure only. These agreements state all over them that they're intended to be subject to the act and the only act that is contemplated by the agreements is that the parties will apply and be licensed by the board. They repeatedly state they're subject to the act. They follow payment guidelines by the act. Importantly, these agreements are actually required by law to be in place at the time of licensure. Section 25E of the Video Gaming Act actually requires. It's the only place where the act references a use agreement. It says that there must be an express written use agreement between licensed parties before machines may be put in. So the whole industry read this and in contemplation for licensure and preparing for industry, got together with who they wanted to have a business relationship and entered into these agreements. Also important is the fact that the very agreements that came about in this case were approved by the gaming board. This entire process has gone on with the involvement and approval of the gaming board. The result here that is sought by Excel, which intervened in the case, is really a retroactive invalidation of these pre-licensure agreements that the board has been accepting throughout the entire licensure procedure. Mr. Hanson, did the board specifically find that action was unfit for licensing due to member associations? There was a notice of denial on July 19 and the letter basically says it's a notice of denial and it did state that, not that Mr. Nichols had any criminal background, but that he had had some associations which the board would not be granted terminal operator license. That is correct. So would allowing the circuit court to uphold the validity of this contract, are we allowing unlicensed entities to receive compensation directly from video gaming operations and because of that denial of licensure, is that the very thing that the act was designed to prevent? No, Your Honor, because the board, the only thing that the circuit court was asked to decide was whether the contract was valid between the two parties. There was no decision about when the agreement does reach the board later on. They don't have to approve it. They don't have to accept the parties. They don't have to allow the video gambling terminals to be installed and they still have complete regulatory control over the process because from the time of application all the way through, they are asking for all of the agreements, all of these pre-licensure agreements, the identity of all the people involved and in fact, a very important fact, is that ultimately over the time span of this case, after we won the circuit court, J&J is approved by the board to operate VGTs under these very agreements at these very location defendants. So the board has had all the information all along. So that's one answer to your question. The other answer to your question is, in our case, particularly this case, the agreement that we had with J&J specified that we would not be paid anything until the gaming board approved a licensed operation and it went live. And this agreement was actually provided to the gaming board on August 27, 2012. So they have to actually approve this entire situation and a game has to start running under a license before my client would be paid anything. Last point on that, Your Honor, is that the board nowhere has taken this position that if the circuit court rules on these agreements, their regulatory ability is inhibited. It's not an argument you find in their brief because they know they have control over the parties. Excel's argument is improper for a very important reason and that is basic principles of contract and statutory interpretation. If you look at the act, it doesn't prohibit the parties from entering into these agreements to prepare. It doesn't prohibit pre-licensure agreements and it doesn't say when the parties may enter into these agreements. And the board's rules don't speak to that either. Another incredibly important point is that if you get past the plain language of the statute and the board rules and you go into the extrinsic evidence part of this, if you look at all the things the board has done over time, the argument that somehow the board has intended all along or believes that these things are illegal or unlawful, it's factually specious. I mean, in this very case, the board saw the assignment agreement between J&J and my client and the board ultimately approved J&J to operate under these very agreements. So to suggest that the board, it's inconsistent. If you're going to say that these are somehow felonious gambling agreements, you're also, if you're Excel, you're arguing that the board has been accepting felonious gambling agreements all along, which is just, I think, a preposterous argument. Outside of our specific facts of the case, when you go back to the evidence here, we put on an uncontroverted case of evidence that, if you're going to look at the board's actual practices, from the very beginning, their 2010 application, specifically says, applicants, provide us copies of any of your mediocre gambling terminal placement agreements. Not use agreements. They've known all along that this is what the industry has been doing. They also ask in that very same agreement, in the very first application, which is still the application in place today, for the parties to, the applicants to identify every person involved in solicitation of an establishment, every agreement relating to a disbursement of money. They're regulating. They're finding out who is involved. And they've known about the pre-licensure agreements. Their investigative overview for the location requires that the location actually have their pre-licensure agreement at the location at time of inspection. That's not something a regulatory body does if it believes these things are illegal. There's been copious board meetings where pre-licensure agreements and the fact that the industry was entering into them has been from Mr. Nader in the industry and Mr. Aronovitz in the industry, which were admitted. That basically shows that, not just in our situation, but for other operators as well, the board has accepted pre-licensure agreements, has accepted their assignment, even where ultimately the ASINOR later on has its license denied. So those facts are really uncontroverted. We even have comments in the record from the board when they were asked about Triple 7. What do you think of that? And they said, we've always taken the position that whether or not pre-licensure agreements can be enforced is a matter for the courts, but we'll get involved when you provide it to us as a use agreement. There's no magical transformation. These are the same agreements that were signed in 2009. The parties intended all along that these would ultimately be submitted to the IGB, and that's how things have worked. Are you saying it's the same agreement, or does the agreement contemplate a final use agreement after the parties are licensed? No, it's the very same agreement. What the parties are doing is they're putting everything in the agreement that they think ultimately the board will require when it is time, when they're licensed. And also, our agreement has a provision that says if the board rules change, the parties agree to amend the agreement. That wasn't necessary here because the board actually approved our amendment. A third important reason here is that if the board set its policies and practices for these agreements, the due process application here is that the board can't come in now and change the rules of the game five years later and then retroactively invalidate agreements it's already approved. And we've got sections in our brief, I won't talk about the authority there, but essentially Excel is arguing in the name of the board's intent that these agreements should all be retroactively invalidated. The board couldn't do that permissibly under the Constitution. So Excel is arguing in the name of the board about something the board cannot do. Lastly, the court has a recognized policy for promoting agreements and their enforceability, and the industry is not well served if parties can't prepare for their eventual licensure. One important thing is the board has shown its ability to regulate, and it prospectively changed Section 320 so that the rule was changed effective July 15, 2014. That doesn't apply here, but what that shows you is the board is capable of regulating this industry, going to JCART with proposed rules, and asking for changes. Thank you. Your time has expired. Thank you. Thank you. Madam Chief Justice, and may it please the court, my name is Stephen Blonder, and I represent Excel Entertainment Gaming. I'm going to be splitting the argument with Mr. Biscott from the Attorney General's Office. I'll be addressing the substantive issues in the case. Mr. Biscott will be addressing the jurisdictional question. Court, this case is about the suitability of individuals to participate in gaming. This case is about whether someone who's denied a license by the Illinois Gaming Board can nevertheless effectively participate in a joint venture with another terminal operator who does get licensed, enjoy the same payment stream going forward as if he was licensed without any burdens. The answer is unequivocally no. Mr. Eaton laid out the procedural posture of how we got here. There's one piece, though, that was missing. This case really started in a lawsuit pending in the Circuit Court of Cook County, where it still is, between Mr. Gantz's client, Excel, and somebody named Mr. Rao. That's where this case begins. When they didn't get the immediate relief they sought in the Circuit Court of Cook County, they started filing cases throughout the southern half of the state against the establishments with the idea, because Excel wasn't a party, they could end-run the case pending in the Circuit Court of Cook County. That's why Excel, because we couldn't offer anything to the bars to defend themselves, and they simply wanted a terminal operator who was licensed to have their establishment have video gaming, Excel successfully intervened in the cases as the real party in interest. When they talk about it's a simple contractual issue, it's not. Excel was the party who the IGB recognized as the one who could have video gaming in each of these establishments. When it came time to install games, deliver games, connect them to the state central system with an IGB officer there, it was Excel that the IGB determined was the one to rightfully be there. Mr. Gantz talks about in his argument, while it was the IGB has sanctioned J&J's equipment in these establishments, that's only in response to the injunction issued by the trial court in this case, for which the court refused to stay it, that then Excel's equipment was removed. The IGB followed the court order. There's no issue here that on its own the IGB said, yes, J&J, you can come in and take the Excel equipment out. What's undisputed is the only valid use agreement is between Excel and the establishment. It's an agreement that was signed after Excel was licensed and the establishment was licensed. Again, go back to the definition of the act. A use agreement is an agreement between a licensed terminal operator and a licensed establishment. The agreement that they seek to enforce is not between a licensed terminal establishment and a licensed operator. It wasn't signed at a time that the bar or establishment was licensed, and action, which is the other signatory on the agreement, was never licensed. What they did was after their application was turned down and denied, they tried to assign their rights away to reap the financial windfall that would come with having a valid agreement. Excel, on the other hand, after it was licensed, after the establishment was licensed, signed a use agreement. That's the agreement that's in play in these cases. It's the only valid use agreement. 777 is what gets us here and causes the problem. 777 starts out from the premise that you can have some kind of gaming contract other than a use agreement. Justice Thomas, your question was right on the money. You can't have an agreement that doesn't fit there. Justice Garmon, you asked about illegal gaming contracts. A gaming contract is illegal unless it's defined in the act. The act defines a use agreement. The act as a whole, taken together with the Riverboat Gaming Act, which is incorporated by reference, is designed to keep out of gaming people deemed unsuitable. People like Mr. Gantz's client, Action Gaming, deemed unsuitable because it's associated with known felons. Yet, when you take the 777 result, it leads to people coming right back into the system. They get everything they would have under the agreement. Again, Mr. Gantz talked about they didn't pay any money for it. It was all a future revenue stream. That's exactly right. They basically said, we're your partner, J&J. We're your silent partner. We're not on the agreement because the gaming board didn't give us a license. But we're going to be in there anyways, taking the financial benefits on a go-forward basis. That's doing an exact end run around the statute. The IGB made two determinations here. One, Action Gaming was unfit and not suitable to participate in gaming. The second, Accel's equipment was proper in the location. The most telling comment to me comes from Justice Schmitt's dissent in SEMS. Again, you look at the third district, you have 777, which is the aberration. Then SEMS comes along. You have two justices who participated in the 777 decision there say, well, it's race judicata. It continues. You have Justice Schmitt, who's new, who says, the decision is palpably erroneous. To call 777 palpably erroneous is to be quite charitable. The fifth district here came to the same conclusion, although the fifth district here kind of went and said, well, we don't want to have a district split because we're trying not to do that. But we find the case is wrong, and we decide it on jurisdictional grounds. The IGB, in response to 777, made statements, tried to change its rule to apply. Everyone who's looked at 777, other than the two justices who sat on it since it was issued, have said it's wrong. This court should follow suit. As Justice Schmitt said, 777 allows mobsters to enter into gaming contracts and then sell those contracts to others who can get licensed. That's not what the legislature envisioned, I hope. Well, that's the same position we're here with today. Someone with known associations with felons, including in gaming, come to Illinois, and they want to participate through the back door. When the IGB says you can't do it through the front door, the only thing that sanctions it is 777. Now, the question of should Action Gaming have gotten a license, IGB decided that. They didn't challenge that. They didn't bring it up on administrative review. They blew their time on that. The issue of Excel's equipment, the IGB made the determination with an IGB officer there that Excel's equipment should be in the facility. Again, they didn't challenge that on administrative review. They could have. They didn't. They accepted those determinations, which were the proper province of the IGB. Instead, we have this kind of convoluted scheme where, well, we'll assign you the contract for a future revenue payment. We're not going to have to do anything. We'll just get the money. The court needs to step in and say no. The Fifth District recognized it couldn't happen. The trial court was hampered because 777 was the only public decision out there. It had to follow. How do you handle the argument that these kind of pre-licensure agreements, where it was unknown whether these people would be able to get a license, and here at least one didn't, but that these kinds of agreements existed in the industry for some time and the board was very well aware of them and perhaps sanctioned them? The board was aware of them. However, take Excel, for example. We had agreements that we signed with people before they may have been licensed. We signed new agreements when they got licensed because those are the enforceable agreements. Again, the concept of a pre-licensure agreement may exist, but it's not enforceable. I mean, take here the situation at the time Action Gaming assigned its contracts to J&J. Action Gaming could not have enforced that agreement. It had no rights. Yet the argument they're making today is J&J, the Assanese rights, should be superior to the rights of the Assanoi. That flies in the face of every basic principle of assignments and of contract construction. So Justice Tice, to the issue of the pre-licensure agreements, they existed, but ultimately it comes down to at the time a video game is installed in a location, the IGP goes to the location and says, Who's your terminal operator? Let us have your contract. And they make a determination. That's what happened here. It's that simple. They talk about simple contract interpretation. That's the name of the game. So, again, I'm going to cede the rest of my time to Mr. Biesplatz. If there's no further questions, we ask that the result be affirmed and if the court takes the issue on the merits, that it abrogate 777 and hold that the only licensed agreements are those under the Video Gaming Act. May it please the court. My name is Frank Biesplatz and I represent the Illinois Gaming Board. This court should affirm the appellate court's decision because the board has exclusive jurisdiction to decide whether a location agreement meets the standards of a use agreement in the administrative code. The appellate court correctly recognized that a court could not declare that a contract for the placement and operation of video gaming terminals is enforceable unless it first determined that it was a valid use agreement under the administrative code. Then, because the Video Gaming Act grants the board the authority to establish minimum standards for use agreements and the power to enforce those standards, the appellate court correctly concluded that the board has exclusive jurisdiction to decide whether those standards have been met. J&J Ventures, Action Gaming, and Accel together raised two challenges to the appellate court's decision. First, they argue that the circuit court had jurisdiction because their claims present a routine contract dispute that does not affect the board's authority over use agreements. Second, they argue that the legislature's grant of authority to the board was not specific enough to vest exclusive jurisdiction. I'll now address those two arguments in that order. First, a contract for the placement and operation of video gaming terminals at a licensed establishment is enforceable if and only if it meets the standards of a use agreement. And this is the case because video gaming is legal only by virtue of the Video Gaming Act. And therefore, any video gaming conduct that does not comply with the act does not receive the statute's protections. And then, because the Video Gaming Act prohibits the placement of terminals at an establishment unless done pursuant to a use agreement, a contract for a placement of terminals at an establishment cannot be enforced unless it meets the standards of a use agreement. Indeed, there's no real dispute that J&J Ventures can operate terminals at Wild's establishment only if its contract with Wild is a valid use agreement. And the party's arguments on the merits make this point clear. J&J Ventures and Action Gaming argue that they should win because their use agreement was not a use agreement when it was assigned, but then became a valid use agreement later when Wild obtained its license. Accel responds that this was never a valid use agreement because it never complied with the standards in the administrative code. Further, all the parties claim that their arguments are consistent with the board's implicit position on the matter. Essentially, they're asking this court to predict what the board would have decided had the issue been brought in front of the board in the first place. Thus, the party's arguments on the merits further highlight the fact that a contract for the placement of video gaming terminals is valid or is enforceable only if it meets the standards of the use agreement. And further, the reasoning in the 777 decision further supports that conclusion. Although that court incorrectly assumed subject matter jurisdiction on the merits, it decided that the party's underlying agreement could not be enforced as a contract until it became a valid use agreement. Therefore, by asking the circuit court here to declare that their contract with Wild was an enforceable contract, J&J Ventures was necessarily asking the court to decide whether their agreement met the standards of a use agreement. But the legislature assigned the responsibility for making that decision to the board. This court's precedents establish that the General Assembly may invest exclusive jurisdiction in an administrative agency by enacting a comprehensive statutory scheme that creates new rights and duties that have no counterpart in common law or equity and which define the matter in such a way as to limit the jurisdiction of the circuit courts. In the Video Gaming Act, the General Assembly legalized the conduct of video gaming and in doing so, created a comprehensive statutory scheme to govern the operation of this brand new industry. In doing so, the legislature created a right to engage in video gaming conduct which never before existed, but only pursuant to a use agreement, a new type of contract that governed previously prohibited activity. And then, the legislature granted the board the authority to set the conditions under which video gaming may occur and the power to impose penalties to ensure that those conditions are followed. Now, as to use agreements, the way that the board generally enforces those standards in the administrative code is at the time the video gaming terminals are placed at an establishment. The board reviews the use agreement at that time and either approves or disapproves of the placement of video gaming terminals at that establishment. If J&J Ventures believed that Wild and or Accel was interfering with its ability to place, to operate terminals under a valid use agreement, it could have brought that, it should have brought that information before the board. Then the board could have decided whether or not to pursue a disciplinary proceeding and at that point could have resolved the use agreement issue. And then, whatever party was unhappy with the board's decision could have obtained judicial review through the administrative review law. And then at that point, the court would have the benefit of the board's input on the matter, which is important because courts generally grant deference to an agency's interpretation of the statute it administers and its own regulations. Here... So in those instances, the final decisions of the board would be reviewed by the appellate court? Well, first the circuit court, then the appellate court, yes, through the administrative review law. And then at that point, the court would have the benefit of the board's input, which the court did not have here, and which the court did not have in 777, because in both those cases they went straight to the circuit court. Now, the parties argued that the video gaming, that the grants of jurisdiction in the Video Gaming Act was inadequate because it did not specifically state that the circuit courts are divested of jurisdiction over the use agreements. But the statute did not have to be that specific. Indeed, this court has consistently held, with one exception, that when determining whether or not the legislature has granted exclusive jurisdiction to an agency, it considers the underlying statute as a whole to decide what the legislative intent was. In skilling that one exception, the court did require language specifically divesting the circuit court of jurisdiction over a certain matter. But this court has not followed that analysis in any other exclusive jurisdiction case, either before or since. And here, when the Video Gaming Act is considered as a whole, it becomes clear that the legislature intended for the board to have the authority to set the standards for use agreements and to ensure that those standards have been met. And really, that's what this case comes down to. It's whether the board can enforce the requirements for a use agreement in the administrative code, or whether a party can circumvent the board's authority by filing a claim in circuit court. Because the legislature, through the Video Gaming Act, granted the board with exclusive jurisdiction to decide whether a contract is a use agreement, the board respectfully asks that this court affirm the appellate court's decision. Thank you, Counselor. Thank you. Your Honors, I'm going to again confine my remarks to the jurisdictional issue. Let's talk about deference to the board. I'm more than willing to give deference to the Gaming Board's interpretation of the act. After 777 was correctly decided, July 26, 2013, there's an email in the record where Counselor J&J said to the board, what do you make of this? What about these agreements? Here is the response from Emily Madison, General Counsel of the IGB. We have consistently said that whether or not a contract entered into by an unlicensed terminal operator in an unlicensed video gaming location is a valid contract is an issue for contract law. We have consistently said that a contract entered into by two unlicensed parties cannot be considered a use agreement pursuant to the adopted rules of the Gaming Board, but whether or not that agreement is valid and enforceable pursuant to contract law is not an issue for the Illinois Gaming Board. That's their position. Now they've done a complete about-face for the first time after they've been aware of these agreements for years, thousands of them, and they say we have exclusive jurisdiction. Mr. Eaton, how is that statement in the record? It came in in the hearing in the Madison County in the wild country. There were exhibits that were presented. There was testimony in that case with respect to the IGB's consistent position on that, Your Honor. So it is part of this record. And I understand that this is de novo review and the court doesn't have to accept the IGB's position, but ironically I just heard counsel say you should give deference to their interpretation. Well, here it is. That's what they've said. Now they've taken a different position before this board, but how can they take a position now that says the act is clear, we have exclusive jurisdiction, when just three years ago they said absolutely not. This is an issue of contract law and this is an issue that should be decided by the courts. And with respect to skilling, counsel said in their brief that skilling which required express divestiture of state courts is an outlier and should not be followed. Well, this court in 2011 in Crossroads cited skilling favorably at paragraphs 3, 27, 43, 44, 47, 50, and 51. It hasn't been mentioned. It's not an outlier. For the very point that there must be some type of express indication that the state courts are divested and there is no express indication, counsel cannot point to anything in this act other than their newly created argument that we now have exclusive jurisdictions. And as I mentioned before in my opening remarks, this is not rocket science. Whether or not it's a use agreement, all it requires is it has to be between someone who the board licensed as an operator in an establishment, a firm to say that there was no inducement, that there has to be some sort of identification. There's five points. This court decides all the time whether or not a contract is valid and whether it followed the statute that gave rise to the cause of action.  In other cases, this court has looked to the relevant act as a whole and the purposes behind it. Yes. So all of the language that this court uses about looking to the entire act, would that make no sense if all that was required is a specific clause divesting the circuit court of jurisdiction? Your Honor, this court addressed that specific issue, your question in Crossroads, and it cited Skilling favorably as saying that where there's no express divestiture, which I believe is your question, that then the burden would be to look at the entire act to determine whether or not there was an intent. So it was considered in that case that the intent of the legislature, but express divestiture was cited, favored by the court, but Crossroads looked at the entire act. But, your Honor, there is nothing in this act that says there has to be hearings of these agreements. Nothing. There's no framework for it. These are not even mentioned, unlike any of the other cases that this court has decided where there's exclusive jurisdiction. Thank you very much. We would respectfully ask that the Fifth District be reversed on this issue of subject matter jurisdiction. As I mentioned before, the circuit court, if you look at the circuit court opinions, they did not decide suitability. The court in 777 did not decide suitability. The issue is not suitability. That remains for the board. My client's not a silent partner. They were part of the application process. The entire asset purchase agreement in all of its terms was provided to the board. These are not agreements or events that are happening as an end run around anyone. The best policy and the best rule of law here is that in 777, and that is let the courts determine whether there's a contract offense or some other thing. But the board still is going to be able to license and regulate its parties. The board didn't get up here and say that the circuit court should not be allowed to decide this because we are unable to regulate if we don't get to make that decision because that's not what the court in 777 or the circuit courts here decided. Let's make something clear. Excel intervened in every one of these cases based on its own pre-licensure agreement that it entered into with each of these defendants before those defendants were licensed. We also put on testimony and interrogatory answers that showed that Excel also took these agreements like J&J did and other operators by assignment. Excel engaged in the very practice that it now condemns. And why? The sole reason is that it wishes to avoid its liability for paying our manager $900,000 to go around and interfere and violate his covenants and breach his fiduciary duty. It wishes to avoid the litigation referenced in Cook County. And that's what that case is about. But this case is simple and it's between the plaintiffs and the defendants. Now, no one has interpreted these agreements as requiring any type of gambling activity at all. The board hasn't gotten up here and said that these were illegal, unenforceable, called for improper activities. And you look at these agreements, they're three-pagers, they all say repeatedly, the parties are only going to engage in activities that are subject to the Act. Importantly, the board has amended its rule. And when JCAR considered their first rule, it rejected it because it was not prospective and it also sought to apply to pre-licensure agreements. The rule, 1800.320, as amended by JCAR, is prospective only. But even more importantly, when you read that rule, to this day the board's rule says that the terminal operator must now be licensed when it enters into one of these agreements. But the establishment does not have to be licensed. So under the board's rule right now, as amended, the parties can enter into an agreement and the establishment does not have to be licensed. There's no argument that you could possibly make otherwise. That's what the rule says. So the idea that unless it's always signed by licensed parties, that it's illegal, it's not square with the board's rule, that's not what the Act says, and it's just not consistent with the policy. At the time of the assignment, my client remained an applicant. Under the board's rule, 695 says that when you receive a notice of denial, a request for hearing is deemed granted until denied. And our application and our request for hearing was not denied until September 20, 2012. The assignment here took place a month before. The board's in charge of regulating these parties. It can decide who should be allowed to divest and assign its assets and get out of the business, which is what my client chose to do instead of appealing further and seeking a license. And it's repeatedly done that with other operators. And the board hasn't argued to the contrary. It didn't controvert a single one of our facts in the statement of fact. It doesn't claim that these agreements... There's no policy reason for going backwards in time. So that's something that's very important. And this case doesn't just affect my client. The argument that's being made by Excel, that all agreements are invalid unless they're signed by two licensed parties, when all agreements can't be assigned, it would affect the thousands of licenses. There are 5,000 licensed establishments. To go back and say in a ruling from this court that all of these agreements are illegal because they're not signed by two licensed parties. It's inconsistent with the rules. But imagine the tumult it would be placed on all of these parties that are currently operating, not my clients, everyone in the industry, operating under these agreements. Respectfully, we believe that the court here should affirm the circuit court. Thank you. Thank you, counsel. Cases number 119870, 871, 872, 873, 874, all consolidated. J.J. Ventures, Gaming LLC v. Wild, Excel Entertainment, as I believe, are taken under advisement as agenda number 13. Mr. Eaton and Mr. Gantz, Mr. Blonder, Mr. Biscott, thank you for your arguments this morning. You're excused at this time.